IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI`I

| | | |
|---|---|---|
| SAMI TAMMAN, | ) | CV. NO. 08-00155 DAE-LEK |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JACQUELINE TAMMAN, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court held a hearing in the above-captioned matter on August 13, 2008 and September 3, 2008. Scott Strack, Esq., appeared at the hearing on behalf of Petitioner; John Remis, Esq., appeared at the hearing on behalf of Respondent.[1] Petitioner participated by telephone. The Court received Petitioner's Exhibits 1 through 7, 14, 15, 27, and 32 and Respondent's Exhibits A1-A18, B1-B14, B16-B17, B19-B20, B23-B24, C1-C12, D1-D6, E1-E5, F, G1-G2, H-Q, S-W, X, AA, BB, CC, DD, EE, HH, II, JJ, and KK into evidence. The following witnesses testified: Paul E. Strack, Maxine Smith-Sullivan, Jacqueline Tamman, Rabbi Itchel Krasnjansky, Donna Johnson, Jinny Aki, Derek Poag, and Nathan Hochhauser.

---

[1] The Court will refer to Petitioner and Respondent collectively as the "Tammans."

After considering and weighing the documentary evidence presented and carefully assessing the credibility of the witnesses, the Court determines the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Petitioner is a 47-year-old native of Sudan with Swiss citizenship.

2. Respondent is a 44-year-old native of Brazil with dual Brazilian and Swiss citizenship.

3. The Tammans were married in Brazil on or around March 25, 1983.

4. The Tammans have four children from this marriage: Alexandre, born October 25, 1999, in Switzerland; Vanessa, born February 22, 2001, in Switzerland; Nathalie, born December 26, 2002, in Honolulu, Hawai`i; and Caroline, born April 8, 2004, in Honolulu, Hawai`i. Alexandre and Vanessa are Swiss citizens. Nathalie and Caroline have dual Swiss and United States citizenship.[2]

5. In the 1990s, the Tammans visited Hawai`i on vacation and decided to purchase property and explore the possibility of making Hawai`i their home.

---

[2] The Court will refer to Alexandre, Vanessa, Nathalie, and Caroline collectively as the "Tamman children" or the "children."

      6.     In December 2001, Petitioner purchased two condominium units at the Kahala Apartments, 4999 Kahala Avenue, Honolulu, Hawai`i (the "Kahala condominiums" or "condominiums").  The Tammans employed realtor Donna Johnson to rent the condominiums when the Tammans were not in Hawai`i.

      7.     While the Tammans were vacationing in Honolulu in 2002, Respondent, who was pregnant, fell in the shower.  As a result, Respondent was advised by Dr. Robb Otani to not travel until after giving birth.  On December 26, 2002, Dr. Otani delivered Nathalie at Queen's Medical Center with assistance from Respondent's Swiss doctor.

      8.     In January 2003, the Tammans returned to Switzerland.

      9.     In July 2003, the Tammans returned to Hawai`i.  Since this date, Respondent and the children have lived at the Kahala condominiums.  Petitioner visited Respondent and the children on numerous occasions from February 2004 through December 2006.

      10.    In December 2003, Respondent, Alexandre, and Vanessa traveled on a cruise ship to Fanning Island in order to extend their authorized stay in the United States.  On or about December 19, 2003, Respondent, Alexandre, and Vanessa re-entered the United States and received authorization to stay as tourists until on or about June 16, 2004.

11. On September 2, 2003, the Tammans enrolled Alexandre and Vanessa in Merry-Go-Round Child Care Center in Honolulu, Hawai`i. Alexandre was also registered to attend school in Switzerland for the 2003-2004 school year.

12. On September 10, 2003, Alexandre and Vanessa were issued Hawai`i Keiki identification cards.

13. On January 23, 2004, the Tammans enrolled Alexandre in Kahala Elementary School, listing Alexandre's physical residence at the Kahala condominiums. Alexandre continues to attend Kahala Elementary School and is now in the third grade.

14. Since 2003, Alexandre has lived exclusively in Honolulu, Hawai`i. During this time, Alexandre participated in various school and social functions in Hawai`i including, but not limited to, the following: (1) underwent an Early Child Tutorial Assessment at Kupono Learning Center in 2005; (2) attended Punahou summer school in 2006; (3) attended Iolani summer school in 2007; (4) received academic achievement certificates in 2007 and 2008; and (5) participated in team sports, school activities, and holiday celebrations.

15. Alexandre has not been to Switzerland since arriving in Hawai`i in July 2003.

16. Vanessa attended KCAA Wai Kahala Preschool in 2004-2005.

17. Since 2003, Vanessa has lived exclusively in Honolulu, Hawai`i. During this time, Vanessa participated in various school and social functions in Hawai`i including, but not limited to, the following: (1) underwent an Early Child Tutorial Assessment at Kupono Learning Center in 2005; (2) attended Punahou summer school in 2006; and (3) participated in team sports, beauty pageants, and holiday celebrations.

18. The Tammans enrolled Vanessa in Iolani School for the 2006-2007 academic school year. Vanessa continues to attend Iolani School and is now in the first grade.

19. Vanessa has not been to Switzerland since arriving in Hawai`i in July 2003.

20. Beginning in 2005, the Tammans hired Jinny Aki to provide swimming lessons two to three times a week to Alexandre and Vanessa at the Kahala condominiums. The Tammans also engaged Aki to provide academic tutoring to Alexandre and Vanessa.

21. Beginning in 2006, Nathalie attended Waiokeola Preschool in Honolulu, Hawai`i, receiving her diploma in June 2007.

22. Nathalie currently attends kindergarten at Kahala Elementary in Honolulu, Hawai`i. Nathalie participates in hula and ballet.

23. Nathalie is an American citizen by birth and has lived in Hawai`i her entire life.

24. Caroline is an American citizen by birth and has lived in Hawai`i her entire life. Caroline has never been to Switzerland.

25. On or about January 23, 2004, Petitioner established a limited liability company in Hawai`i named Swiss Hotels Management & Consulting LLC ("SHMC"). Petitioner and Respondent were the only members of SHMC, which listed as its business address 1614 South King Street, Honolulu, Hawai`i, 96826.

26. Also on or about January 23, 2004, Petitioner and Respondent entered into an Operating Agreement whereby Respondent would govern the business of SHMC in Hawai`i.

27. As of March 1, 2004, Petitioner had made an initial capital contribution of $375,000, which represented a 75% ownership interest, in SHMC.

28. SHMC was formed, at least in part, for the purpose of obtaining legal immigration status for Respondent to remain in the United States. To that end, the Tammans filed an application to obtain L-1 (intra-company executive) status for Respondent. Respondent's application was denied in April 2004.

29. Petitioner opened bank accounts at the Kahala branch of the Bank of Hawai`i with both Petitioner and Respondent listed as account holders. Since July

2003, Petitioner has deposited or transferred significant sums of money for the support of Respondent and the Tamman children in Hawai`i.

30.     On or about November 10, 2005, Petitioner paid the balances due on the mortgages attached to the Kahala condominiums.

31.     In late 2006, Petitioner obtained in Switzerland new Swiss identification cards and new and/or renewed passports for the Tamman children.

32.     In February 2007, Respondent hired an attorney in Switzerland to obtain a divorce from Petitioner.  Respondent was subsequently informed that she would have to return to Switzerland to conduct the divorce in person.

33.     In April 2007, Respondent filed for divorce in Hawai`i.

34.     On or about June 22, 2007, Respondent allegedly cut off all communication between the Tamman children and Petitioner.

35.     On August 13, 2007, Petitioner commenced action under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980, T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, reprinted in Fed. Reg. 10493 (1986) (the "Convention") with Swiss authorities for the return of the children  The Swiss authorities forwarded Petitioner's request to the U.S. State Department for processing.

36.     The United States and Switzerland are signatories to the Convention.

37. On December 12, 2007, Respondent filed U visa applications on behalf of herself and Alexandre. The U visa is available to noncitizens who have suffered physical or mental abuse and was created to provide eligible immigrants with authorization to stay in the United States.

38. On April 4, 2008, Petitioner filed the instant Petition for Return of Children and Petition for Immediate Issuance of Show Cause Order to Respondent (the "Petition") (Doc. # 1). The Petition is brought pursuant to the Convention and the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601 et seq. ("ICARA").

39. On May 6, 2008, the Court held an initial hearing in this matter. Following argument by the parties, the Court (1) continued the hearing on the Petition to May 28, 2008, (2) ordered Respondent to turn over all passports in her possession to the Clerk's Office by May 7, 2008, and (3) ordered the parties to submit supplemental briefs by May 19, 2008. The parties orally stipulated to limiting the scope of the issues before the Court to the question of the children's habitual residence.

40. On May 12, 2008, the Court issued a written order re-stating its directives from the May 6, 2008 hearing (Doc. # 17).

41. On May 29, 2008, at the request of Petitioner's counsel, the Court continued the hearing to June 13, 2008.

42. On June 10, 2008, the Court continued the hearing to July 25, 2008.

43. On June 26, 2008, the Court continued the hearing to August 1, 2008.

44. On July 7, 2008, removal proceedings before the Immigration Court in the matter of Tamman, Jacqueline, Tamman, Alexandre J., and Tamman, Vanessa R., under Case Nos. A99-634-538, 539, and 540, were administratively closed.

45. On August 1, 2008, the Court conducted a status conference, at which the Court (1) ordered the parties to submit briefing on the legal issues associated with the immigration status of Respondent and the Tamman children, and (2) granted Respondent's oral motion to continue the hearing. The Court re-set the hearing for August 13, 2008.

46. On August 13, 2008, the Court held the first day of the hearing on the instant Petition. The Court set further hearing for August 26, 2008.

47. On August 21, 2008, the Court continued the hearing to September 3, 2008.

48.     On September 3, 2008, the Court held the remainder of the hearing on the Petition and ordered the parties to submit proposed findings of fact and conclusions of law by September 11, 2008.

49.     At the hearing, Rabbi Itchel Krasnjansky testified to the following: (1) the Tamman children regularly attend religious and Hebrew training at Chabad of Hawai`i, located at 410 Atkinson Drive, Honolulu, Hawai`i; (2) Petitioner stated to Rabbi Krasnjansky his intent for his family to permanently reside in Hawai`i; (3) Petitioner expressed an interest in building a temple in Hawai`i; and (4) Petitioner expressed a desire to sell his hotels in Switzerland and join his family in Hawai`i.

50.     At the hearing, Derek Poag testified to the following: (1) he has known Petitioner since the late 1990s; (2) Petitioner discussed with Poag his plans to have his family live in Hawai`i, including having his children educated in private schools in Hawai`i; (3) Petitioner informed Poag that it was dangerous for the Tamman children to live in Switzerland because of his affiliation with the C.I.A. and other intelligence agencies; (4) Petitioner discussed with Poag, a member of the architectural review committee at the Kahala condominiums, his plans to open the walls between the condominiums; (5) Poag advised Petitioner that he could not remove walls but suggested opening the lanai dividers to permit access between the condominiums; (6) Petitioner followed Poag's advice and

removed the lanai dividers; and (7) Petitioner expressed to Poag a desire to purchase a hotel in Hawai`i and to invest in Nathan Hochhauser's automobile business.

51. At the hearing, Donna Johnson testified to the following: (1) she met Petitioner in or about 2001, when he expressed an interest in purchasing real property in Hawai`i; (2) Johnson was the realtor through whom Petitioner purchased the Kahala condominiums; (3) Petitioner indicated to Johnson that he would use the condominiums for vacationing in Hawai`i and then rent them; (4) Petitioner also indicated his intent to have his family permanently reside in Hawai`i; and (5) Petitioner engaged Johnson as a realtor to look for small businesses and hotels in Hawai`i.

52. At the hearing, Nathan Hochhauser testified to the following: (1) he met the Tammans while they were vacationing at the Kahala condominiums; (2) Petitioner admitted to Hochhauser his intent to move his family to Hawai`i; (3) Petitioner sought Hochhauser's advice in acquiring the condominiums; (4) in December 2006, Petitioner met Hochhauser in California to discuss investing $500,000 in Hochhauser's used car business; (5) Petitioner admitted to Hochhauser that his intent in investing in Hochhauser's business was to obtain immigration status to remain in the United States; (6) Petitioner admitted to Hochhauser his

desire for his children to br privately educated in Hawai`i; (7) Hochhauser and his family have socialized with the Tammans for years; and (8) in or about March 2008, Petitioner admitted to Hochhauser that he could no longer afford the condominiums but suggested that Respondent rent a house instead.

53. At the hearing, Respondent testified to the following: (1) she and Petitioner vacationed in Hawai`i and decided that they would like to move and raise their children there; (2) after 9/11, Hawai`i real estate prices declined and Petitioner wanted to take advantage of the opportunity; (3) Petitioner purchased the Kahala condominiums on December 31, 2001; (4) Petitioner believed that Hawai`i would be a safe place to raise the children because of Petitioner's affiliation with government intelligence agencies; (5) Petitioner rented the condominiums and used them for family vacations until July 2003; (6) Petitioner bought a new automobile in 2003 under the name of SHMC; (7) the registration and insurance for this automobile remain current; (8) Petitioner and Respondent enrolled the Tamman children in Hawai`i schools; (9) Petitioner supported Respondent and the children in Hawai`i for five years; and (10) in August 2006, Petitioner deposited $70,000 in the Tammans' joint bank account in Hawai`i.

54. On September 11, 2008, the parties submitted their respective proposed findings of fact and conclusions of law (Docs. ## 39 & 40).

## CONCLUSIONS OF LAW

55. The Convention was designed to address the problem of parental international child abduction. Mozes v. Mozes, 239 F.3d 1067, 1069-70 (9th Cir. 2001). The signatories perceived that parents were wrongfully taking their children across international lines "in search of a more sympathetic court" for custody proceedings. Id. at 1070. The Convention sought to eliminate this motivation by allowing for the prompt return of abducted children. Id.

56. "The twin objectives of the Convention are (1) to secure the prompt return of children wrongfully removed [ ] or retained," and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, Art. 1, T.I.A.S. No. 11,670 at 4; see also In re Prevot, 59 F.3d 556, 558 (6th Cir. 1995).

57. The Convention's focus is not the underlying merits of a custody dispute but instead whether a child should be returned to a country for custody proceedings under that country's domestic law. Holder v. Holder, 392 F.3d 1009, 1013 (9th Cir. 2004).

58. The Convention came into effect in the United States via ICARA on July 1, 1988. See 42 U.S.C.§ 11601. ICARA establishes the procedures for implementation of the Convention in the United States, including granting

concurrent original jurisdiction of actions arising under the Convention to state courts and the United States District Court. 42 U.S.C. § 11603.

59. As such, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 11603(a). However, this Court does not have the authority to determine the merits of any underlying custody claim to the Tamman children. 42 U.S.C. § 11601(b)(4).

60. Under Article 3 of the Convention, a petitioner must show by a preponderance of the evidence that the removal or retention of a child was "wrongful." Convention, Art. 3, T.I.A.S. No. 11,670 at 4. Removal or retention is "wrongful" where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was <u>habitually</u> <u>resident</u> immediately before the removal or retention; and
>
> b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

<u>Id.</u> (emphasis added); <u>see</u> <u>also</u> 42 U.S.C. § 11603(e)(1), (f)(2).

61. Petitioner has the burden or proving by a preponderance of the evidence that (1) Respondent retained the children away from their habitual residence, and (2) Respondent's retention of the children was in breach of Petitioner's rights of

14

custody under the law of the children's residence.  See 42 U.S.C. § 11603(e)(1); Shalit v. Coppe, 182 F.3d 1124 (9th Cir. 1999)

62. By agreement of the parties, the only question to be determined in the instant matter is whether the Tamman children were wrongfully removed from their habitual residence by Respondent.  Accordingly, Petitioner must establish by a preponderance of the evidence that Switzerland was the children's habitual residence immediately preceding the alleged retention on June 22, 2007.

63. Although the term "habitual residence" is undefined by the Convention, the Ninth Circuit has developed an analytical framework to provide intelligibility and consistency in the determination of a child's habitual residence. Papakosmas v. Papakosmas, 483 F.3d 617, 622 (9th Cir. 2007).

64. Habitual residence is a mixed question of law and fact.  Mozes, 239 F.3d at 1073.

65. In determining whether a child has acquired a new habitual residence, the Court should first consider whether there has been a settled intent to abandon a prior habitual residence.  Id. at 1075.  In this inquiry, "the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence."  Id. at 1076 (internal citation omitted).  In most cases, those persons are the parents.  Papakosmas, 483 F.3d at 622.

66.     The transformation to a new habitual residence also requires an actual change in geography and the passage of an appreciable period of time, one sufficient for acclimatization.  Id. (citing Mozes, 239 F.3d at 1078).  "Importantly, '[h]abitual residence is intended to be a description of a factual state of affairs, and a child can lose its habitual attachment to a place even without a parent's consent.'"  Id. (quoting Mozes, 239 F.3d at 1081) (emphasis in original)).

67.     "Thus, even when the settled intent of a child's parent is not clear, a district court should find a change in habitual residence if the objective facts point unequivocally to a person's ordinary or habitual residence being in a particular place."  Id. (internal quotations and citations omitted).

68.     Here, Petitioner has fallen well short of meeting his burden of establishing that Switzerland was the habitual residence of the Tamman children on June 22, 2007, the alleged date of wrongful retention.

69.     As of this date, the three oldest Tamman children – Alexandre, Vanessa, and Caroline – had not been to Switzerland in almost four years. Nathalie has never been to Switzerland.

70.     The preponderance of the evidence before this Court establishes that the habitual residence of the children as of the alleged date of wrongful retention was, in fact, Hawai`i.

71. Petitioner evinced a settled intent was for the Tamman children to make Hawai`i their habitual residence. This determination is supported by the following evidence: (1) Petitioner purchased properties in Hawai`i and, beginning in July 2003, consented to the rest of the Tamman family living at these properties; (2) Petitioner regularly visited Respondent and the children from February 2004 to December 2006; (3) Petitioner expressed to numerous people in Hawai`i his desire to make Hawai`i his family's home; (4) Petitioner opened bank accounts and deposited money in them in order to support Respondent and the children in Hawai`i; (5) Petitioner explored business opportunities in Hawai`i; (6) Petitioner formed the Hawaii-based SHMC with the intent of affording Respondent legal immigration status so that she could remain in the United States; (7) Petitioner consented to and participated in decisions regarding the children's education in Hawai`i; (8) Petitioner supported the children in their pursuit of scholastic, religious, and social endeavors in Hawai`i; and (9) Petitioner discussed building a religious temple in Hawai`i.

72. Even assuming that Petitioner revoked his consent to the children living in Hawai`i (either in late 2006 when he obtained new Swiss identification cards and passports, or in 2007 upon Respondent's filing for divorce), this

assumption does not alter the fact that Petitioner not only consented to but actively aided the children in making Hawai`i their settled residence from July 2003 onward. According to the Ninth Circuit, "given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there be lingering parental intentions to the contrary." Mozes, 239 F.3d at 1078.

73.  The Court was presented with no evidence suggesting that the children's translocation to Hawai`i was for a specific, delimited period.

74.  Regardless of the settled intent of Petitioner, the objective facts point unequivocally to the children's habitual residence being in Hawai`i.

75.  It is undisputed that Respondent and the children were in Hawai`i for almost four years prior to the alleged wrongful retention. This represents both a substantial change in geography from Switzerland and an appreciable passage of time sufficient to allow the Tamman children to acclimate to Hawai`i.

76.  In fact, there is ample probative evidence indicating that the children are scholastically, religiously, and socially entrenched in Hawai`i. They attend school, participate in extracurricular activities, and attend religious classes.

77. This Court was presented with no evidence suggesting any connection, save citizenship, of the children to Switzerland.

78. The immigration status of Respondent, Alexandre, and Vanessa is not determinative for purposes of establishing habitual residence.  Habitual residence should not be determined through the technical rules governing legal residence or common law domicile but, rather, by the facts and circumstances of each case.  See Friedrich v. Friedrich, 983 F.2d 1396, 1401 (6th Cir. 1993).  The facts and circumstances of this case clearly indicate, for the reasons set forth above, that the children's habitual residence as of the alleged date of wrongful retention was not Switzerland but was, in fact, Hawai`i.

79. In light of the foregoing, the Court determines that Petitioner has not established that Switzerland was the habitual residence of the Tamman children as of the date of the alleged wrongful retention here.  As such, the Court DENIES the Petition.

80. The Court additionally ORDERS the return of Respondent and the children's passports, which were previously deposited with this Court.

IT IS SO ORDERED.

DATED: Honolulu, Hawai`i, October 8, 2008.



David Alan Ezra
United States District Judge


Tamman v. Tamman, CV. NO. 08-00155 DAE-LEK; FINDINGS OF FACT AND CONCLUSIONS OF LAW